UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CATHARINE C. LUND,  )
  )
    *Plaintiff*  )
  )
v.  )    No. 2:11-cv-19-JAW
  )
WILLIAM B. SMITH, et al.,  )
  )
    *Defendants*  )

*MEMORANDUM DECISION ON MOTION FOR PRE-JUDGMENT ATTACHMENT*

The plaintiff in this action alleging fraud, breach of fiduciary duty, breach of contract, and violations of certain Maine and Massachusetts statutes seeks an attachment in the amount of $2,000,000 against the property of the defendants. Oral argument was held before me on May 12, 2011. I grant the motion, but in a lower amount, and not against defendant Rebecca Smith.

**I. Applicable Legal Standard**

A party may move for attachment in this court "in accordance with state law and procedure as would be applicable had the action been maintained in the courts of the State of Maine[.]" Local Rule 64. "An attachment of property shall be sought by filing with the complaint a motion for approval of the attachment. The motion shall be supported by affidavit . . . meeting the requirements set forth in subdivision (i) of this rule." Me. R. Civ. P. 4A(c). Subdivision (i) requires the affidavit to "set forth specific facts sufficient to warrant the required findings[.]" *Id*. (i).

Under Maine law, attachment and attachment on trustee process are available only for a specified amount, as approved by order of court, and only upon a finding that it is more likely

than not that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance or other security shown to be available to satisfy the judgment. *Id*. (c), Maine R. Civ. P. 4B(c). There has been no showing in connection with the motion for attachment in this case that any liability insurance or other security is available to satisfy the judgment sought.

## II. Factual Background

The plaintiff proffers the following facts by affidavit; where those facts are disputed by affidavits filed by the defendants, I so indicate.

The plaintiff, a 1964 graduate of Colby College, spells her first name "Catharine" and has never used any other spelling. Declaration of Catharine C. Lund in Support of Plaintiff's Motion for Pre-Judgment Attachment ("Plaintiff's First Affidavit") (Docket No. 7) ¶ 2; Declaration of Catharine C. Lund in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Pre-Judgment Attachment ("Plaintiff's Second Affidavit") (Docket No. 27) ¶ 2. After raising two children and tutoring inner-city elementary school children, the plaintiff, who had divorced in 1989, moved to Maine in 2004. Plaintiff's Second Affidavit ¶ 3.

In early 2004, the plaintiff was considering selling a portion of property she owned in East Blue Hill, Maine, including two houses that she rented out and approximately six acres of land. Plaintiff's First Affidavit ¶ 3. She told her financial advisor and friend, Jane Mitchell, about her desire to sell the property. *Id*. ¶ 4. Soon thereafter, Mitchell invited the plaintiff to Grafton, Massachusetts, for lunch. *Id*. When the plaintiff arrived, Mitchell insisted that she meet

with defendant William Smith, who was waiting for them in a conference room. *Id*. The plaintiff had met Smith several times during her interactions with Mitchell. *Id*.[1]

During this meeting, Smith explained that the plaintiff could avoid paying capital gains taxes on the sale of the Blue Hill property by undertaking a so-called "1031 exchange," investing the proceeds of the sale of the East Blue Hill property in replacement properties within a certain time limit. *Id*. ¶ 5.[2] The plaintiff agreed to do this, and Smith told her that he would help her through the process. *Id*. The plaintiff had not heard of a "1031 exchange" before Smith described it to her and urged that she undertake it. Plaintiff's Second Affidavit ¶ 4. Early in her discussions with Smith, the plaintiff emphasized that she did not want to take out any mortgages in connection with the exchange. Plaintiff's First Affidavit ¶ 6.

On October 12, 2004, the plaintiff entered into a purchase and sale agreement to sell 6.3 acres and two houses from her East Blue Hill property for $2.2 million. *Id*. ¶ 7. Soon thereafter, she entered into an Exchange Agreement with Asset Preservation Inc. to effectuate a 1031 exchange. *Id*. On December 8, 2004, she closed on this sale, netting approximately $1.7 million. *Id*. ¶ 9. Throughout December 2004 and the first few months of 2005, she began to investigate various potential replacement properties. *Id*. ¶ 10.

In December 2004 or January 2005, $500,000 of the proceeds from the East Blue Hill sale were invested in a Best Buy store in Ohio. *Id*. ¶ 11. The plaintiff claims that Smith made this investment "unilaterally" and only informed her after the transaction was completed. *Id*. She did not sign the Replacement Property Identification Form for that investment, although someone signed her name to it. *Id*. ¶ 11 & Exh. 9. Smith contends that Mitchell arranged this

---

[1] The plaintiff says that Smith was Mitchell's "boss." Plaintiff's First Affidavit ¶ 4. Smith insists that Mitchell was an "independent agent" of his company and not an employee. Affidavit of William B. Smith ("W. Smith Affidavit") (Docket No. 20-1) ¶ 2. This factual dispute has no bearing on my ruling on the motion for attachment.
[2] Smith contends that Mitchell had already discussed a 1031 exchange with the plaintiff before he discussed it with her. W. Smith Aff. ¶ 2. This factual dispute has no bearing on my ruling on the motion for attachment.

3

transaction. W. Smith Affidavit ¶ 2. The plaintiff claims that, at approximately the same time, Smith informed her that he had "unilaterally" invested the remaining $1.2 million "temporarily" in a "land deal" in Grafton, Massachusetts, that "satisfied the 1031 rules" and would "remain flexible" in order to give her more time to find a replacement property. Plaintiff's First Affidavit ¶ 12.

Smith contends that, after Mitchell told him that the plaintiff was having difficulty locating a suitable replacement property, he "offered to allow her to purchase" a portion of property in Grafton, Massachusetts, that he was in the process of purchasing with a plan to convert it into office space. W. Smith Affidavit ¶ 3. He says that this "was a personal real estate investment between me and" the plaintiff, as to which he was not acting as her financial advisor. *Id*. He asserts that the plaintiff "agreed to become a buyer of the Property along with me." *Id*. ¶ 4. The plaintiff's $1.2 million apparently represented the lion's share of the purchase price. Plaintiff's Second Affidavit Exh. 25 at 3 (listing 1031 exchange as $1.152 million out of a total purchase price of $1.234 million).

Smith goes on to state that the plaintiff and he "executed a Promissory Note pursuant to which we borrowed from Commonwealth Bank the sum of $245,000" to be used to renovate the property and "carry it on a cash flow basis until we could secure tenants." W. Smith Affidavit ¶ 4. "All of the necessary documents concerning the purchase of the Property and the loan were provided to Ms. Lund and she signed them." *Id.* The plaintiff, on the other hand, says that she did not complain about this transaction immediately because Smith told her that she could get out of the temporary "land deal" at any time and put the money into a second replacement property of her choosing. Plaintiff's First Affidavit ¶ 12.

The plaintiff states that she was unaware of the existence of this property, located at 2 South Street in Grafton, before April 29, 2005, when Smith and his wife arrived at her house with some papers Smith said the plaintiff had to sign "for the IRS." *Id*. ¶¶ 14, 19. Smith said that he and his wife were in a hurry and handed the plaintiff signature pages from various documents, not the full documents, and told her that she needed to sign them "for the IRS." *Id*. ¶¶ 19-20. The plaintiff signed the signature pages. *Id*. ¶ 20. As Smith was leaving, he handed the plaintiff a real estate brochure for a large, converted Victorian mansion in Grafton, Massachusetts and said, "Here, look what you just bought." *Id*. ¶ 21.

The plaintiff called Mitchell to complain, and Mitchell told her that Smith had told Mitchell that the plaintiff "had blessed the whole deal in advance." *Id*. ¶ 22. The plaintiff says that she did not do so. *Id*. She sent several emails to Smith stating that she was unhappy with what he had done in this regard. Plaintiff's Second Affidavit ¶ 5. She went to a lawyer in Bangor, Maine, in July 2005. *Id.* The lawyer repeatedly demanded documents from Smith, who produced them very slowly and often in unsigned form. *Id*.

The Personal Financial Statement filed with the mortgage application for the 2 South Street property includes several errors: the plaintiff's salary in 2005 was zero, not $12,000; her rental income was zero, not $35,000; she lived in Falmouth, Maine, not "Blue Hills"; and her interest income was approximately $13,000, not $6,200. Plaintiff's First Affidavit ¶ 17 & Exh. 12. The plaintiff would not have approved submitting the document with these errors. *Id*. The Borrower Identification Form for this mortgage wrongly stated that the plaintiff was living in Groton, Massachusetts. *Id*. ¶ 18 & Exh. 13. The information on the Loan Presentation Sheet for the mortgage under the heading "Project Type" was obtained from Smith. Affidavit of Carlisle Bindoo (Docket No. 28) ¶ 2.

Smith moved his financial-advising business into the 2 South Street property. Plaintiff's Second Affidavit Exh. 25; Plaintiff's First Affidavit ¶ 27. According to the plaintiff, he has repeatedly refused the plaintiff's requests to sell the property and has routinely been late paying rent, if it is paid at all. Plaintiff's First Affidavit ¶¶ 29-30. He has loaned funds from WBS Properties, LLC -- a partnership which purports to include the plaintiff, but of which she claims to have been unaware at the time of its creation -- to his company. *Id.* ¶¶ 25, 32. From 2005 on, Smith has threatened to pay for any legal expenses incurred as a result of any action taken against him by the plaintiff out of partnership funds. *Id*. ¶ 34.

Since May 2005, Smith has provided the plaintiff with "numerous" monthly profit and loss statements regarding the 2 South Street property. W. Smith Affidavit ¶ 5. He has provided annual information that the plaintiff could use in filing her personal tax returns. *Id*. He contends that he has paid the plaintiff "tens of thousands of dollars over the past five years" out of his own pocket despite the fact that "the financial operation of the Property" has resulted in a negative cash flow, so that the plaintiff "in fact should have been providing me with cash to help fund the operating deficit." *Id*. ¶ 6. He does not directly contradict the plaintiff's assertion that at least some part of this "operating deficit" resulted from the failure of his financial-advising company to pay rent, his lending of partnership money to his financial-advising company, and his payment of property management fees to himself. W. Smith Affidavit, *passim*.

### III. Discussion

Under Maine law, which is applicable to the attachment procedure here, *Telerent Leasing Corp. v. Pine State Plumbing & Heating, Inc.*, 231 F.Supp.2d 352, 355 (D. Me. 2002), a court deciding a motion for attachment "assesses the merits of the complaint and the weight and credibility of the supporting affidavits." *Porrazzo v. Karofsky*, 1998 ME 182, ¶7, 714 A.2d 826,

828. In addition, in this case, the defendants argue only that the plaintiff has failed to establish that Smith violated any duty to her and that, if she was fraudulently induced to enter into an agreement, she subsequently ratified that agreement by her conduct. Defendants' Opposition to Plaintiff's Request for Pre-Judgment Attachments ("Opposition") (Docket No. 20) at 5-7.

These arguments address only Counts II (fraudulent inducement in the mortgage application), III-IV (breach of fiduciary duty), and possibly V (constructive trust). First Amended Complaint ("Complaint") (Docket No. 4) ¶¶ 37-55. Therefore, if the plaintiff has established that she is more likely than not to succeed on Count I (fraud in acquisition of 2 South Street), VI (breach of contract), VIII (violation of Massachusetts Consumer Protection Act), or IX (violation of Maine Unfair Trade Practices Act), it will not be necessary to consider the defendants' arguments.[3] *See Telerent*, 231 F.Supp.2d at 357.

With respect to Count I, the plaintiff cites the following evidence: her first affidavit, the "misspelled and obvious forgeries in the API selection forms," the "raft of errors and falsehoods in the mortgage application," the misspelling of her name in several other documents, the use of several different addresses for her, the "obvious forgery in the Easement," Smith's decision "to immediately move his own company into the building," and her "many complaints thereafter." Plaintiff's Motion for Pre-Judgment Attachment ("Motion") (Docket No. 5) at 9. I agree that, taken together, several of these items combine to meet the more-likely-than-not standard.[4]

---

[3] The defendants argue, briefly, that the plaintiff's first affidavit "should be properly excluded from evidence" because it "contains inadmissible hearsay" and "merely set[s] forth general, unsubstantiated allegations[.]" Opposition at 7-8. A footnote refers to "alleged oral communications with certain Defendants and representatives of said Defendants" and "certain written correspondence and other documents that qualify as hearsay and are properly excluded from evidence." *Id*. at 8 n.3. The court will not attempt to guess to which communications and documents the defendants refer. In the absence of identification of specific statements and documents, the defendants' argument cannot and will not be considered. The affidavit is sufficiently detailed; it indulges in neither general nor unsupported allegations.

[4] At oral argument, counsel for the defendants emphasized that several of the plaintiff's claims, including Count I, allege fraud, which must be proved by clear and convincing evidence. *See, e.g., Bradley v. Kryvicky*, 574 F.Supp.2d

7

On the Replacement Property Identification Letter, Exh. 9 to Plaintiff's First Affidavit, the purported signature of the plaintiff spells her first name incorrectly. Exhibit 10, another Replacement Property Identification Letter with a different date, also has her first name incorrectly spelled in the purported signature. The plaintiff's statement disputing three of the entries under "annual income" in the Personal Financial Statement, Exhibit 12 to Plaintiff's First Affidavit, her salary, her rental income, and her interest income, as well as noting the incorrect home address entered on the document, Plaintiff's First Affidavit ¶¶ 17-18, are not disputed by the defendants. The defendants do not dispute that the address entered for the plaintiff on the Borrower's Identification Form (Exh. 13 to Plaintiff's First Affidavit) is also incorrect. Plaintiff's First Affidavit ¶ 18.

A different address, also incorrect at the time, is given in the Term Note dated April 29, 2005, Exh. 15 to Plaintiff's First Affidavit at 1, 4, and the Loan Agreement for the mortgage, Exh. 14, *id*., at 1. A document dated May 24, 2005, granting an easement over the 2 South Street property, again misspells the plaintiff's name in the purported signature, despite the fact that the correct spelling appears in print directly below the signature line. Exh. 17 to Plaintiff's First Affidavit.

I find it extremely unlikely that the plaintiff would knowingly sign documents that misstated her address and even less likely that she would repeatedly, but not always, sign her name with an incorrect spelling. *Compare* Exhs. 5, 11, 12, 14, 15, 19 *with* Exhs. 9, 10, 17. The presence of incorrect financial information in the plaintiff's financial statement, necessary to obtain the mortgage on the 2 South Street property, also supports the plaintiff's version of events concerning the purchase of 2 South Street as a replacement property for the plaintiff's planned

---

210, 219 (D. Me. 2008). I conclude that it is more likely than not that the plaintiff will meet this evidentiary standard with respect to Count I.

1031 exchange, including that she did not discuss any mortgage with Smith. Plaintiff's First Affidavit ¶ 16. The fact that Smith's business moved into the house on the property immediately (presumably, after it was renovated with the funds generated by the mortgage) also supports the plaintiff. Nor does Smith deny that he presented the plaintiff with only the signature pages of certain documents relevant to the acquisition of 2 South Street and pressured her to sign them immediately, then left her house after she had done so.

The defendants contend that Massachusetts law must provide the standard for all of the plaintiff's substantive claims. Opposition at 6 n.2. I need not decide this issue, because the cited evidence makes it more likely than not that the plaintiff will be able to prevail on Count I in either state. *See St. Francis De Sales Fed. Credit Union v. Sun. Ins. Co.,* 2002 ME 127, ¶ 26, 818 A.2d 995, 1003 (elements of common-law fraud); *Fordyce v. Town of Hanover*, 929 N.E.2d 929, 936 (Mass. 2010) (same).

The recited facts appear to me also to establish violations of the Maine Unfair Trade Practices Act (5 M.R.S.A. § 207) and the Massachusetts Consumer Protection Act (Mass. G.L. c. 93A), which form the basis of Counts IX and VIII, respectively, of the amended complaint.

A final issue remains. The defendants assert that the plaintiff "has not shown that the amount of her claims . . . is an amount equal to or greater than the amount of the attachment sought." Opposition at 8. They aver that the plaintiff "simply overlooks the fact that she has property interests in both the [2 South Street property] and another." *Id*. But, the plaintiff's claim is that her $1.2 million should not have been spent on this property in the first place. She seeks return of what was allegedly taken from her in the first place.

In addition, if the defendant's response is deemed relevant, the plaintiff states that she has repeatedly asked Smith to sell the 2 South Street property and he has refused. Plaintiff's First

Affidavit ¶¶ 29, 31.  Further, the defendant has allowed one or more substantial liens to be placed on the property, liens that run against him or his financial-advising company and not against the plaintiff.  From all that appears in this record, the plaintiff never intended to buy the property in the first place, never consented to the property being encumbered, her current ownership interest in the property is unclear, she has been unable to regain any of the money invested in the property, ostensibly for her, and the current market value of the property is unknown.  Exhs. 21-22 to Plaintiff's First Affidavit.  The plaintiff's submissions are sufficiently detailed as to the amount of attachment sought with respect to the $1.2 million.

Because I am granting the motion for an attachment and attachment on trustee process based on Count I, I conclude that the amount of the plaintiff's initial "investment" in the 2 South Street property, $1.2 million, is the appropriate amount of an attachment.  Claims for damages arising out of the defendant's alleged use of that money may or may not be precluded by an award of interest on the original amount, but, in any case, that issue has not been raised by either party.  The plaintiff's attorney asserted at oral argument that she was more likely than not to recover $500,000 in punitive damages and that that amount should be added to the $1.2 million for purposes of the attachment.  However, the plaintiff has not at this point submitted sufficient evidence of actual malice or of deliberate conduct so outrageous that malice toward her can be implied, the standard for punitive damages in Maine.  *Glenwood Farms, Inc. v. Ivey*, No. 03-217-P-S, 2005 WL 1773743, at *2 (D. Me. July 26, 2005).  The plaintiff has not met this "high hurdle" in her submissions in support of her motion for approval of attachment.  *See id*.

I also deny the motion as to defendant Rebecca Smith, as no basis for liability on her part has been presented in the motion and its accompanying documents.

## IV. Conclusion

The motion for pre-judgment attachment and attachment on trustee process is **GRANTED** in the amount of $1,200,000 (one million two hundred thousand dollars) against defendant William B. Smith and defendant W. B. Smith Cos. and otherwise **DENIED.**

Dated this 24th day of May, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge